**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **JEFFREY MIMS and MARK MIMS** | * | **CIVIL ACTION** |
| **VERSUS** | * | **NO: 04-3130 c/w 04-3137** |
| **JAMES LeBLANC, WARDEN** | * | **SECTION: "D"(6)** |

## REPORT AND RECOMMENDATION

This matter was referred to the United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to Title 28, United States Code, Sections 636(b)(1)(B) and (C), and, as applicable, Rule 8(b) of the Rules Governing Section 2254 cases. Upon review of the entire record, the Court has determined that this consolidated matter can be disposed of without an evidentiary hearing. For the reasons set forth below, it is recommended that the instant petitions be **DISMISSED WITH PREJUDICE.**

## Introduction

Petitioners Jeffrey Mims and his brother Mark Mims, are state prisoners presently incarcerated in the Dixon Correctional Institute, Jackson, Louisiana. The Mims

brothers were both convicted of manslaughter, violations of La. R.S. 14:31.  Jeffrey and

Mark Mims are each serving forty year sentences.  Jeffrey Mims and Mark Mims were

jointly tried by a jury, from April 15 thru 20, 1996, on an indictment charging each of them

with one count of first degree murder of one Eddie Charles.[1]  The jury returned a responsive

verdict of manslaughter as to both Mims brothers.  On June 25, 1996, the district court

sentenced the Mims brothers to serve forty years of incarceration.[2]   The petitioners

appealed their convictions and sentences to the Louisiana Court of Appeal, Fourth Circuit

which affirmed the convictions and vacated and remanded the sentence of Mark Mims

because of an error patent.  **State v. Mims et al.**, 769 So.2d 44 (La. App. 4th Cir., June 21,

2000).  Mark Mims was resentenced on July 27, 2000, to served forty years of incarceration

as a second offender.[3]  The Mims' petitions for  writs of certiorari were denied by the

Louisiana Supreme Court on June 22, 2001.  **State v. Mims et al.**, 794 So.2d 781 (La.

6/22/01); **State v. Mims,** 794 So.2d 782 (La. 6/22/01).  In March 2002, petitioners filed their

---

[1]See State Record, Vol. 1 of 9 Supplemental; Indictment.  The original indictment also charged two other co-defendants, Keith Stewart and Leroy Stewart, with first degree murder.  Both Stewarts eventually plead guilty to manslaughter and were each sentenced to serve ten years of imprisonment at hard labor.  (Also see State Record, Vol. 1 of 9, Supplemental, Docket Master, pages 12-13.)

[2]See State Record, Vol. 1 of 9, Supplemental, Docket Master, pages 12-14, entries dated 06/25/96 and 07/10/96.  (Mark Mims was sentenced as a second offender.)

[3]See State Record, Vol. 7 of 15, page 167, Minute Entry dated July 27, 2000.

applications for post-conviction relief in the state district court.[4]  The applications were denied on July 25, 2003.[5]  Jeffrey and Mark Mims applied for supervisory writs, in the Louisiana Court of Appeal Fourth Circuit on September 23, 2003.[6]  The Louisiana Fourth Circuit denied the writ on November 13, 2003. **State v. Jeffrey and Mark Mims**, No. 2003-K-1692 (La. App. 4th Cir. Nov. 13, 2003).[7]  Petitioners filed application seeking supervisory and/or remedial review in the Louisiana Supreme Court on December 10, 2003.[8]  The application was denied on September 3, 2004.  **State of Louisiana v. Jeffrey and Mark Mims,** No. 2003-KP-3386 (La. Sept. 3, 2004).[9]

Jeffrey Mims and Mark Mims, via counsel, filed separate federal applications for habeas corpus relief on November 17, 2004.  The court granted Jeffrey Mims' Motion to Consolidate the two cases, as the applications were identical regarding the claims presented and closely related in fact and law.[10]  Jeffrey and Mark Mims raise the following

---

[4]See State Record, Vol. 2 of 15, for copies of  the applications.

[5]See State Record, Vol. 3 of 15, for a copy of Judge Dennis J. Waldron's Ruling denying the applications.

[6]See State Record, Vol. 3 of 15, for copies of the applications.

[7]See State Record, Vol. 3 of 15, for a copy of the ruling.

[8]See State Record, Vol. 4 of 15, for a copy of the application.

[9]See State Record, Vol. 4 of 15 for a copy of the ruling.

[10]See Federal Record, No. 04-3137 "D," Doc. No. 7, Motion to Consolidate Cases.  See attached Order granting the motion on February14, 2005.  Both Mims are represented by Attorney Kris A. Moe.

eight issues in the instant consolidated petition:  (1) insufficient evidence; (2) ineffective assistance of counsel for failure to request a specific intent requirement as to principals; (3) improper ruling on motion to suppress; (4) failure of trial judge to recuse himself; (5) ineffective counsel for failing to properly investigate the recusal issue; (6) prejudicial testimony from criminalist; (7) ineffective counsel for failing to object to other crimes evidence; (8) prosecutor's improper argument.[11]   The State concedes that the subject consolidated actions were timely filed.[12]  Moreover, the State further concedes that all of the issues have been presented to the Louisiana Supreme Court and are thereby exhausted.[13]  See **Rose v. Lundy**, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982).  Accordingly, the court shall proceed to address the merits.

## Statement of Facts[14]

The facts of this case are lengthy, conflicting and complex and thus require detailed recitation. Lillian Ann LeBoeuf testified that she arrived at her 5127 Cameron Blvd. home on the night of March 7, 1993, to find her son, Edward "Eddie" Charles, dead of

---

[11]See Federal Record, No. 04-3130 c/w No. 04-3137 "D," Rec. Doc. No. 1, respectively.

[12]See Federal Record, Doc. No. 6, Response to Habeas Corpus Petition, pages 4-5.

[13]See Federal Record, Doc. No. 6, Response to Habeas Corpus Petition, page 2.

[14]The statement of facts is based upon this Court's review of the trial transcript and the Louisiana Court of Appeal, Fourth Circuit's published opinion, **State of Louisiana v. Mark A. Mims, Jeffrey Mims, et al**., 769 So.2d 44, at 51-61 (La. App. 4th Cir. June 21, 2000).  (Footnote omitted.)

gunshot wounds. She had last seen and spoken with him around 6:00 p.m. that evening. She stated that the Mims brothers were very good friends of Eddie; that she had known the brothers for almost all of their lives; that Mark Mims had lived with her and her son in the early part of 1970; that Eddie had been the best man in Mark Mims' wedding; and that Eddie was the godfather to Mark Mims' child.

New Orleans Police Homicide Detective Lance Reed testified that he led the on-scene early morning investigation of the death of Eddie Charles. Det. Reed identified evidence related to that investigation, including photographs and a diagram of the scene; spent cartridge casings recovered near the victim's body; one live 9mm cartridge found in the street directly in front of the victim's residence; a black baseball cap with the letter "P"; and the victim's slippers and pajamas. Det. Reed said that the victim sustained multiple gunshot wounds. Det. Reed further testified that, later that evening, he viewed a television news broadcast concerning the arrest of armed individuals in the French Quarter and that he recognized a van displayed there as being similar to the description of one seen by a witness near the scene of the homicide. Det. Reed had the 9mm firearms seized in connection with the French Quarter arrests tested to determine whether one of them had been fired during the homicide. After receiving the test results, Det. Reed obtained arrest warrants for the Mims brothers, who by then had been released from police custody. Det. Reed stated on cross-examination that the live 9mm round was found later during the morning of the murder, after

being pointed out by neighbors. He also stated that no fingerprints were found on the live round.

Dr. Susan Garcia, who was qualified by stipulation as an expert in the field of forensic pathology, performed an autopsy on the victim's body. She said the victim sustained six identifiable gunshot entrance wounds and two exit wounds, with wounds 4 and 6 both potentially fatal because of internal bleeding. All of the wounds were caused by bullets fired at least eighteen  inches from the entrance sites. Four projectiles were recovered from the body, correlating to wounds numbered 2, 3, 4 and 6. Dr. Garcia was able to mark her initial "G" on the base of each bullet except the bullet from wound 2.  Dr. Garcia testified that she also performed an autopsy on the body of one Walter Ward, who was shot to death on June 30, 1995.

New Orleans Police Officer Michael Nievez testified that he was the first officer to arrive on the scene of the homicide in the early morning hours of March 7th. He assisted in recovering eight 9mm spent casings near or under the body. He testified that no weapon was found on or near the victim's body.

Adrian Charles, one of the victim's brothers, testified that he knew the Mims brothers. He went to the scene of the homicide where, in the morning light, he discovered a bullet lying in the street. He said that he asked someone to park an automobile to prevent other vehicles from disturbing it and that he notified police, who collected the bullet.

United States Border Patrol Agent Ramone Rivera testified that he and his partner were in New Orleans in March of 1993 to make a war-on-drugs presentation to school children. Agent Rivera and his partner walked around the French Quarter one night, consumed three beers, and returned to their hotel room at approximately 10:00 p.m. Agent Rivera returned to the French Quarter around 1:30 a.m., in search of a slice of pizza. He observed some individuals in black jackets and Oakland Raiders hats beginning to fight with some other individuals outside of a daiquiri shop. He saw a male draw a gun from the inside of his jacket. When the male turned around, he apparently dropped a magazine out of the gun. Agent Rivera said he walked alongside the male for about two blocks and informed him that he could get into significant trouble for carrying a concealed weapon. The male responded, "Hey, you better shut the f--- up, Mexican, or I'm going to pop you." Agent Rivera walked back to the location of the fight to find a group of people looking down at the ground. He then saw on the ground a magazine containing bullets, which he retrieved after identifying himself as a Border Patrol Agent. He subsequently approached a police officer, told him about the person dropping the magazine, and turned it over to the officer. As Agent Rivera was returning to his hotel room, he observed the individual with the gun and another individual inside of a black van. Agent Rivera wrote down the license plate number of the van and returned to give it to the police officer with whom he had earlier spoken, alerting him that the individual with the gun was inside of the van. At trial he identified the piece of

paper plate on which he had written the license plate number. Agent Rivera viewed a photograph of a van and said its license plate number was the same as the number of the van in which he had seen the gunman. He identified Mark Mims in court as the gunman, remembering a distinctive mole or burn mark on the left side of Mims' cheek. On redirect examination, Agent Rivera said the gun Mark Mims pointed at him was a Beretta.

On cross-examination, Agent Rivera said he could not recall the exact date that he was in the French Quarter. He recalled that the initial confrontation he observed outside the daiquiri shop involved approximately fifteen individuals-males, females, blacks and whites-but he could not remember how many were in each gender and ethnic category. Agent Rivera also admitted that he could not recall whether Mark Mims was driving the black van or was seated in the front passenger seat when he saw him again.

Former New Orleans Police Officer Bernard Mitchell testified that he was a police officer in March of 1993 and that he participated in the arrests of the Mims brothers on March 7th. He was sitting in another officer's patrol car at Iberville and Chartres Streets when he heard a radio broadcast that a black Chevrolet van, license plate number T001028, with several armed subjects in it was being sought in connection with an aggravated assault. Within seconds, he observed the described van stopped on Iberville Street by Chartres Street. Officer Mitchell slid into the driver's seat of the patrol car and signaled to the other officer, and they followed the van to St. Louis and Bourbon Streets, where the van stopped behind

another vehicle waiting to cross Bourbon. Officer Mitchell exited his vehicle, drew his firearm and approached the left rear of the van. At that time, Jeffrey Mims stuck his head and right arm out of the window and pointed a loaded 9mm Beretta handgun at the officer. Officer Mitchell ordered Mims to drop his gun, and Mims complied. Officer Mitchell identified a 9mm Beretta handgun in evidence, serial number *BER014378*, as the one seized from Jeffrey Mims.  The van was relocated to the Eighth Police District station due to the busy Saturday night Bourbon Street crowd. Officer Mitchell said the van contained a .44 caliber revolver, two 12-gauge shotguns, three AK-47 assault rifles, and a second loaded 9mm Beretta handgun. The Beretta seized from Jeffrey Mims had Pachmayer rubber grips on it; the second one did not. Officer Mitchell identified, without objection from the defense, all of the firearms seized from the van, numerous loaded magazines for the rifles, numerous rounds of ammunition, and a bayonet for one of the rifles. Bags of clothing and a briefcase containing U.S. currency were also recovered from the van. Officer Mitchell said he interviewed Agent Rivera at approximately 10:30 a.m., getting the agent to identify the piece of paper on which the agent had written down the license plate number of the van.

Officer Mitchell admitted on cross-examination that it was not a crime for the defendants to have all of those firearms and munitions in their possession. He also said that it was not a crime to have a large quantity of money in one's possession. Officer Mitchell did say that he was a victim of an aggravated assault that morning.

Former New Orleans Police Officer Mark McElvin was in the police car with Officer Mitchell when they stopped defendants' van on March 7 [th]. He approached the passenger side front door, whereupon Mark Mims pointed an AK-47 rifle at him and then immediately lowered it, before the officer ordered him to do so. He pulled Mark Mims out of the vehicle and handcuffed him. Officer Letellier took control of Mark Mims, while Officer Nazar approached the sliding door of the van, ordering anyone else inside to come out. No one else was in the van. He said the van contained two brief cases, one black and one brown, two black suitcases, and two garbage bags. Officer McElvin prepared the search warrant application for the contents of the van. The brown briefcase contained a large sum of money, the black one a bayonet, jewelry, beepers and a cellular telephone. The suitcases and the garbage bags contained clothing. Officer McElvin said he participated in counting the money, which totaled approximately $39,000. He identified a photograph of Mark Mims and said Mims had a scuff mark or brush burn around his eye and some blood on one of his hands.

New Orleans Police Canine Officer Gary Lee testified that his drug-detecting dog searched the van and detected nothing. After officers placed items in the van, the dog alerted on some folded currency and a briefcase of currency. Officer Lee admitted that he had heard that $70,000 in currency was seized from the van, but he said he never handled any of the money.

10

New Orleans Police Lieutenant Louis Kistner testified that, as a sergeant assigned to the asset forfeiture division, he investigated the asset forfeiture aspect of the Mims brothers' arrest. He issued a receipt to the Mims for a total of $44,619 in currency, along with jewelry, pagers and one cellular telephone.

Orleans Parish Assistant District Attorney Greg Hangartner testified that he handled the asset forfeiture proceedings transferring ownership of the currency and other items seized from the Mimses to the State of Louisiana, based on probable cause to believe that they were either the proceeds of narcotics trafficking, were purchased with things derived from the proceeds of narcotics trafficking, and/or were used to facilitate narcotics trafficking.

New Orleans Police Officer Kenneth Leary was qualified by stipulation as an expert in the field of firearms identification. He examined two 9mm Beretta pistols; eight spent cartridge cases collected from the homicide scene; and three bullets, two lead core bullet fragments and two copper jacket fragments recovered during the autopsy of the victim. Officer Leary determined that the eight spent cartridge casings and three bullets had all been fired by one of the Beretta pistols. However, he said it was impossible to determine whether the four fragments were fired from a particular firearm; thus, it was possible that they were fragments of the three other bullets that he was able to match or that they had been fired from another gun. Importantly, he identified the Beretta pistol with the "black" grips as the gun

to which he matched the eight casings and the three recovered bullets.

Officer Leary identified the various other firearms recovered from the van, as well as magazines and ammunition. At trial, he examined the live cartridge found at the scene and said it was manufactured by Federal Cartridge Corporation, while he said that the bullets recovered from the victim's body and the spent cartridge casings were manufactured by Winchester. Officer Leary also said that Beretta pistols fire semi-automatically and sometimes can jam for several reasons, such as being fired when the shooter fails to lock his wrist.

Gay Mims Willis, Mark and Jeffrey's sister, testified that she purchased two 9mm Berettas for them for Christmas of 1990. She was shown one Beretta 9mm pistol and said it looked like one she had purchased. She was shown the murder weapon, with the black grips, and stated that she had never seen it before. The State introduced into evidence a federal firearms transaction form showing that a Gay Mims had purchased, in particular, a Beretta pistol, serial number *BER014378Z*; and Ms. Mims admitted that her signature was on the form.

Jeffrey Michael "Mike" Charles, also a brother of the victim, testified that he knew the Mimses. He said the victim and Mark Mims operated a body shop business for approximately one year. A third person, Walter Ward, later came into the business. Jeffrey Charles said Mark Mims wanted Eddie Charles out of the business, so Eddie Charles left.

12

The business continued to operate for six to eight months afterward. Jeffrey Charles said he once overheard Walter Ward say that he put a "tombstone" in the front yard of the home of Mark Mims' mother, and Jeffrey Charles conveyed this information to "Bubba" Mims. Jeffrey Charles said he had never heard Eddie Charles make any threats directed toward the Mimses.

Leo Wyre, Jr., the Mimses' cousin, testified that he had worked for Creative Concepts, the body shop once owned by Mark Mims and Eddie Charles. Wyre said he also knew Walter Ward. According to Wyre, one evening in March of 1993, Mark Mims and another individual, both dressed in black, entered Wyre's home and pulled guns on him and Zena Harris, who was then his girlfriend but was his wife at the time of the trial. Mark Mims, armed with a 9mm pistol, asked Wyre if he knew where Walter Ward was and then ordered Wyre to accompany him to look for Ward. Wyre, who had just gotten out of the shower, grabbed some clothes, put them in a plastic bag and left with the two men. They forced Wyre at gunpoint into a black van, which was driven by Jeffrey Mims and occupied by a fourth individual. Wyre learned months later that the other two individuals were Keith and Leroy Stewart. Wyre noticed two AK-47s and a "Street Sweeper" in the van. At some point Mark opened a suitcase, telling Wyre it contained $200,000.

Eventually, having failed to locate Ward, Mark Mims decided to look for Eddie Charles. The five men eventually went to Eddie Charles' home, where Mark directed Jeffrey

to walk Wyre up to the door and ring the doorbell. Wyre said Mark directed Jeffrey to shoot him if he did not cooperate. Eddie came outside, and Jeffrey drew his gun and started talking to Eddie. Wyre said he walked back down the driveway. The van pulled up, and Mark and Keith Stewart exited with guns and walked to Eddie's door. Wyre reentered the van and heard Eddie call out twice for his mother and approximately six subsequent gunshots. Jeffrey, Mark and Keith returned to the van, and someone told Leroy Stewart to pull off slowly. Mark said his gun had jammed; Jeffrey and Keith Stewart said nothing.

The men then drove to the Carrollton area, again looking for Ward, but did not find him. Wyre said Mark wanted to shoot at the residence where Ward supposedly lived but did not because no one appeared to be home. The five men then proceeded to the French Quarter, parked the van on Iberville Street one block from Canal Street, and went into a daiquiri shop. Wyre said everyone was carrying a gun except him. Jeffrey became involved in an altercation with someone, and they left the daiquiri shop. Wyre began walking toward Canal Street, but Leroy and Keith Stewart caught up to him, and one of them told him to wait and see if the Mimses would catch up with them. The three walked to the Sheraton Hotel; Wyre accompanied the Stewarts because they were armed, though he admitted they did not force him. He stayed in a hotel suite with the Stewarts until they saw a newscast reporting the Mimses' arrests. They then told Wyre he was free to leave.

14

Wyre said he was interviewed by a police officer in October and told him the story he told the court. He signed a statement and was booked with first degree murder for the killing of Eddie Charles, but the District Attorney's Office refused the charge the next month. Wyre said the charges were refused before he ever spoke with anyone from that office. Wyre did admit to a 1988 conviction for possession of stolen property.

Wyre testified on cross-examination that the clothes he took with him that night had been in a plastic drycleaner's bag, with his name on it, and that they were left in the van, leading to his eventual arrest. He admitted that Mark Mims had told him that a tombstone threatening Mark's life had been given to Mark's mother. Wyre said that on the night of the murder Keith Stewart and the Mimses were all armed with 9mm firearms. Wyre said that, when he parted company with the Stewarts, Keith Stewart gave him a few dollars and a 9mm firearm, which Wyre wrapped in a shirt and kicked under a sofa in the hotel. Wyre admitted that he knew the District Attorney's Office could recharge him. He told police that he believed that there had been a problem between Walter Ward and Mark Mims over a lawsuit, from which Mark had received a settlement and taken the money. He admitted telling police that Eddie Charles had been attempting to get Mark Mims to pay Ward the money allegedly owed to him. Wyre said the six shots he heard at the murder scene came in quick succession.

Zena Harris Wyre testified that, when she parked her car to go to Leo Wyre's residence on the night of March 7th, a dark, apparently black, van pulled up. As she walked

toward Leo's door, she saw two black males walking up behind her. They asked if Leo was home, and one of them said to tell Leo that his cousin was asking for him. Mrs. Wyre identified Mark Mims in court as that person, whom she said she had never seen before that night. The men pulled guns, and Mark told Leo that he had to go somewhere with them because someone was threatening Mark's mother. Leo resisted the idea, and the other individual told Mark to shoot Leo if he did not want to cooperate. The other individual pointed a gun at Mrs. Wyre, told her that she could not be trusted, and that she was also going to have to accompany them. Mrs. Wyre kneeled and pleaded with them not to take her. She said Leo was scared, pacing around as if he did not know which way to turn. Mrs. Wyre never called police about the incident but told Leo's parents the next morning, thinking that they should decide whether to call the police, as it involved Leo's cousin. Mrs. Wyre said on cross-examination that she did not see Leo again until the next evening, Sunday.

Orleans Parish First Assistant District Attorney Camille Buras, since elected as a criminal court judge, identified a screening form reflecting that the prosecutor in the instant case screened a first degree murder charge against Leo Wyre, and refused the charge. Ms. Buras testified on cross-examination that the decision not to prosecute a person arrested for a homicide is made by a panel of senior assistant district attorneys: the First Assistant District Attorney; the Chief of Screening; the Deputy Chief of Screening; the Chief of Trials; the Deputy Chief of Trials; and some other division heads who might be present at a

particular charge conference. Ms. Buras said she was not aware of any deals made in exchange for the refusal of the charge and said she would have been aware of any such deals.

FBI Special Agent Robert Lee, of Houston, Texas, testified that he interviewed Mark Mims after Mims waived his *Miranda* rights. Mark told him that someone named Keith, who worked for Jeffrey Mims' auto body shop in Houston, approached him with a plan to purchase firearms in Houston for $3,000 and to sell them in New Orleans for $10,000. Mark and Jeffrey flew to Baton Rouge with the firearms on the Friday before their arrest, purchased a van there, and drove to New Orleans. They were traveling with $75,000. On Bourbon Street they met Keith, who took the van with all of the guns and said he was going to see about making the deal, while the Mimses waited in the French Quarter. Keith returned approximately thirty or forty minutes later and told the Mimses that the deal did not transpire because the purported buyer did not have the money. The Mimses left, and as they were driving through the French Quarter, police stopped them and placed them under arrest. Mark said he later learned that the guns were to be sold to Eddie Charles and informed Agent Lee that, if he had known that, he would not have participated in the deal. Mark said he believed the police must have taken approximately $30,000 of the money he and his brother had.

Agent Lee said Jeffrey Mims told a different story in several aspects. Jeffrey identified "Keith" as Keith Stewart. Jeffrey stated that all four men-the Mimses and Stewarts-had flown from Houston to Baton Rouge. They checked into the Sheraton Hotel under Leroy

Stewart's name, and the Stewarts took the van to sell the guns to someone named "Slick"; but they returned within two to three hours without completing the sale because the purported buyer did not have the money. Jeffrey stated, as had Mark, that if he had known the guns were to be sold to Eddie Charles he would not have participated in the deal. He also stated that he had $75,000 with him but had received a receipt from the police for only $44,000. Jeffrey said that Keith Stewart was known to carry a 9mm firearm. Agent Lee said that, as a result of the information obtained from the Mimses, Leroy and Keith Stewart were arrested; and Agent Lee subsequently interviewed Leroy Stewart.

FBI Agent Lloyd Diaz, also of Houston, also interviewed Jeffrey Mims after he waived his *Miranda* rights. Jeffrey gave two statements. In the first one, he said that he and Mark Mims flew to Baton Rouge alone. In the second statement, he said that he, Mark and the Stewarts flew to Baton Rouge. In the first statement, Jeffrey said the two 9mm pistols owned by him and his brother were never out of their possession in New Orleans, and he speculated that police framed them in order to steal some of their money. In his second statement, he said that the Stewarts left in the van with "all" of the guns in order to complete the gun deal. Jeffrey admitted that he was aware that the guns were to be sold to someone who could not legally buy them. Agent Diaz testified on cross-examination that he did not believe Jeffrey was telling the truth when making either statement.

18

Leroy Stewart testified that he and his brother, Keith Stewart, worked for Creative Concepts in Houston, Texas. Keith asked him if he wanted to go to New Orleans; and Keith, accompanied by the Mims brothers, picked him up in Houston. There were some drugs in the car, which Mark Mims eventually gave to a woman named Sheila, whom they were supposed to meet later in Baton Rouge. Leroy said there were some guns in the trunk of the car; these were taken in suitcases on a flight to Baton Rouge. The four men rented a room at a Baton Rouge motel, and Mark Mims went to talk to Sheila. The other three men subsequently went to meet with someone, and when they returned they had a briefcase full of money: $89,000, Leroy was told. This briefcase had not been with them when they traveled from Houston to Baton Rouge.

The four then left for New Orleans to look for Walter Ward, someone unknown to Leroy. He drove Sheila to the airport in New Orleans, rented a nearby hotel room, and waited for the other three to pick him up. They picked him up in a black van and drove around, drinking and looking for Ward. They eventually went to Leo Wyre's residence, where Leroy and Mark Mims went inside with guns. Wyre left with them, and after an unsuccessful search for Ward, they drove to Eddie Charles' residence at the direction of Wyre. Charles' car was not there, so they left and returned later. At that time, Wyre and Jeffrey went to the front door, and Wyre returned to the van alone. Leroy heard Jeffrey yelling for help, and Mark Mims and Keith Stewart left the van to assist him. Leroy heard

someone saying he did not have "anything to do with it," then heard two shots, followed by a number of shots. Leroy, who had gotten behind the wheel of the van, was preparing to drive off when Keith and the Mimses jumped back into the van. Mark said his gun had jammed, while Jeffrey asked if anyone had seen him "hit him." The five men went to the French Quarter, where Jeffrey got into an argument with a white male. Jeffrey and Mark disappeared, while Leroy, Keith and Wyre returned to the hotel. They learned that the Mimses had been arrested, and Leroy returned to Houston, while Keith stayed to wait for the Mimses to be released on bond. Leroy was indicted for first degree murder but pled guilty to manslaughter in exchange for his true testimony. He did not know what sentence he would receive, but he knew the sentencing range was from zero to forty years.

Leroy Stewart testified on cross-examination that the men drove around New Orleans for two or three days and could have left Houston three or four days before the shooting. He said that they all were wearing black clothing on the night of the shooting. Leroy Stewart admitted that he stayed in prison for approximately two and one-half years before entering into the plea agreement with the State. He also admitted that his second statement, in which he said Jeffrey Mims went to front door of Eddie Charles' residence, was given the day after he gave his first statement, in which he said that Mark Mims and Leo Wyre went to the door.

Keith Stewart testified that he worked with Jeffrey Mims for approximately one year at Mims' body shop in Houston. He said he recalled hearing Mark Mims say that he wanted to kill Walter Ward because Ward had threatened him. Jeffrey told him that Mark had supposedly been stopped by police and had drug money taken from him and that Ward did not believe him and wanted the money. Jeffrey also told him that Ward had sent a tombstone to the home of Mrs. Mims and a threatening letter to Houston. Keith Stewart said their plan was to come to New Orleans and to look for Ward; Eddie Charles was drawn into the events only at that last minute, when they could not find Ward. Mark Mims planned to sell five kilos of cocaine to someone in Baton Rouge and to use the money to pay back Ward. Stewart said he and the Mimses stole the cocaine from some Colombians. The three were armed at that time with 9mm pistols, Jeffrey's .44 magnum revolver,  and three AK-47 rifles. When they bought the AK-47s, they had one of the Berettas fixed because it had been jamming.

In Houston, they picked up Leroy Stewart and met "Sheila" to give her the cocaine to drive to Baton Rouge. They then flew to Baton Rouge, and Leroy waited at the hotel with Sheila while Keith and the Mimses went to sell the five kilos of cocaine to "James" for $17,500 per kilo. They paid Sheila, and Leroy drove her to the airport. They then bought the van, spray-painted the windows black to keep people from seeing inside, and drove to New Orleans, checking into the Sheraton Hotel. They brought all of the guns upstairs, loaded them, and returned them to the van, after which they unsuccessfully searched

for Walter Ward. Throughout their search, the two sets of brothers were all dressed in black clothing they purchased in New Orleans at a J.C. Penney department store. According to Keith Stewart, they did this because they believed it is difficult to identify black men in black clothing.

Eventually, the four went to Leo Wyre's residence, where Mark Mims and Leroy Stewart went inside and returned with Wyre. After continuing to search for Ward at several nightclubs, they drove past Eddie Charles' residence. They later returned and observed Charles' car parked there. Jeffrey Mims, gun in hand, and Wyre exited the van. Wyre knocked on the front door and asked Charles to come outside. When Charles came outside, Jeffrey appeared from around a corner of the house, still holding a gun, and grabbed Charles by the shirt. Charles began protesting that he did not have anything to do with the matter. Jeffrey began moving Charles toward the van, and Jeffrey called for help. Mark and Keith exited the van, and Mark began striking Charles in his head with a gun. Charles fell to the ground, and Keith attempted to pick up his legs when he was accidentally struck in the head by Jeffrey. Keith stepped back for a moment to regain his senses, when Mark shot Charles twice before his gun jammed. Jeffrey then shot Charles, and the three men ran back to the van.

Keith Stewart further testified that, after the shooting, the five men went to the French Quarter for drinks. At that point, Keith and the Mimses were armed with 9mm pistols.

He saw Jeffrey engaged in a dispute with a white male outside a daiquiri shop. Mark pulled a gun on the individual, and then everyone separated. Keith said he, Leroy and Wyre returned to the hotel, where they eventually learned that the Mimses had been arrested. He gave Wyre some money and, over Wyre's protests, his 9mm pistol, and Wyre left. After the Mimses got out of jail, Keith traveled with them to Las Vegas and California.

Former New Orleans Police Officer Michael Nazar testified on behalf of defendants that, on March 7, 1993, he was assigned to a foot patrol on Bourbon Street. A person who identified himself as an off-duty federal agent approached and informed him that there were four to six  black males dressed in black commando gear carrying guns down Bourbon Street. He did not pay much attention to it until the agent came back, showed his identification and said the males were in a van. Nazar did not recall the agent's name, and the agent did not give him anything at that time. Nazar and his partner, Officer Nicholas Cook, proceeded to an intersection, where Nazar saw a van driving off. He notified the dispatcher and subsequently heard a radio call that officers were behind the van on St. Louis Street. Nazar approached the van and noticed Jeffrey Mims point a handgun out of the window. Jeffrey Mims was removed from the vehicle, and Officer Bernard Mitchell secured Mims' Beretta 92F pistol inside of his belt. Nazar observed Mark Mims attempting to get an AK-47 out of the window, and he was also brought under control. Nazar drove the van to the Eighth District Police station. There were two other 9mm pistols in the van: another Beretta and a

Taurus. There was also a large amount of money in a black briefcase. On cross-examination, Nazar admitted to a prior conviction for aggravated battery, occurring after he left the police department. He also said on cross-examination that the Beretta pistol seized from Jeffrey Mims had black rubber Pachmayer grips on it.

Louisiana Attorney General's Office Criminal Division Investigator Reed Scott Bailey testified that he interviewed the Mimses' mother, Yvonne Mims, at her residence on April 10, 1996. He said she led him to her backyard where she turned over to him five pieces of concrete that, when put together, looked like a crude headstone. "Mark KKK" was written on the headstone.

Yvonne Mims testified that someone placed a headstone on her lawn in February or early March of 1993 and that, consequently, she and her family left the residence. Mrs. Mims stated on cross-examination that the headstone was left perhaps two weeks before she saw the television report of her sons' arrests. She admitted that she telephoned Mark Mims to report the incident to him. She said that after the headstone was found on her lawn, her husband talked to Eddie Charles' brother; and subsequently she, her husband, her mother and another of her sons, left town.

Eddie Mims, defendants' father, testified about the headstone found lying on his front lawn. He received a telephone call the next day from Mike Charles-he said he and Mike call each other "Bubba"-regarding the headstone. As a result of these occurrences, Mr.

24

Mims and his family left town for approximately eight days. Mr. Mims testified on cross-examination that Mike Charles was the brother of Eddie Charles. Mr. Mims said that he was not afraid of Mike Charles or Eddie Charles. When asked of whom he was afraid, Mr. Mims replied, "The other man." When asked if that person was Walter Ward, Mr. Mims said he thought it was.

Mark Mims testified that he used to own and operate Creative Concepts in New Orleans, which bought, sold and refurbished cars. His partners were Eddie Charles and Walter Ward, who was a silent financial partner. Mims stated that a misunderstanding arose with Eddie Charles regarding an insurance claim in the amount of $35,000; and Mims was severely beaten by Ward and a couple of his friends. As a result of this incident, Mark returned to Houston to work with Jeffrey Mims' business, the original Creative Concepts. He said that Jeffrey's business was restoring and reselling expensive foreign cars and that it occupied three and one-half acres. Ward showed up in Houston one day to discuss the insurance money, and Mark thought Ward left with the matter resolved, as Ward had received all the money that he could receive from the insurance claim. Eddie Charles also went to Houston, and asked Mark to come to his hotel room and discuss what had transpired with Ward, but Mark did not go.

In February of 1993, Mark heard that Ward had told Eddie Charles that Ward was serious about collecting the money Mark owed him. Shortly thereafter, Mark's mother

telephoned him about the headstone on her front lawn. Mark telephoned Marvin Charles, Eddie's brother in Atlanta, who informed him that Ward was serious in his demands. Eddie Charles subsequently informed Mark that Ward was demanding $50,000, as Ward had seen the business in Houston and knew Mark could get the money. Mark consulted with Jeffrey, and they decided to go to New Orleans to pay Ward. Mark said that they actually planned to pay Ward more than $50,000-money which Jeffrey had-to ensure that Ward would leave their family alone. Mark said that, because he believed Ward to be dangerous, they decided to buy some weapons. However, they did not plan to confront anyone, but only to deliver the money.

Mark denied any allegations of acquiring drugs from Colombians. He said he eschewed the drug life, fled New Orleans because he found out how Ward obtained his money, and wanted nothing to do with that life. They rented a Lear jet to fly the guns and money to Baton Rouge, where they rented a van, drove to New Orleans, and checked into the Sheraton Hotel. They then went to Wyre's residence, whereupon Wyre, who he said had a gun, voluntarily accompanied them. Neither he nor Leroy Stewart pulled a gun at Wyre's residence.

Later, they simply drove to Eddie Charles' residence with the money, planning to settle the debt and return to Houston. Eddie did not appear to be there, so they unsuccessfully searched for him at some nightclubs. When they returned to Eddie's residence,

26

Mark went alone to the door, carrying $85,000 in a briefcase. Eddie informed him that Ward had nothing to do with the money and that he, Eddie, wanted it instead. He and Eddie became involved in a scuffle and fought over Mark's gun, which fell onto the sidewalk. Keith and Leroy Stewart came up, and Leroy pushed Mark away, while Keith picked up the gun and shot Eddie.

Mark testified that Eddie Charles had christened his first child; that he had known Eddie his whole life; and that he did not want anyone to shoot Eddie. He said that after the shooting the three ran back to the van and went to the French Quarter. He did not want to tell the police that Keith had shot Eddie, because he felt Keith had acted to protect him. He implicitly denied pulling an AK-47 on a police officer. He was told police had seized some $44,000 from them. He admitted that Jeffrey had wired some $15,000 to Houston before their arrests.

On cross-examination, Mark stated that Eddie Charles had been the best man at his wedding; that Eddie was the godfather to one of his children; and that he had lived with Eddie and Mrs. Charles for a period of time. While he admitted being on Bourbon Street after the shooting, he denied going to a daiquiri shop or drawing a gun. He said he had never seen Agent Rivera before the trial. He admitted that they purchased the black van in Baton Rouge at a muffler shop, as one of the Stewart brothers had testified. He denied meeting anyone in Baton Rouge named Sheila or knowing a Sheila. He said the dispute with Ward over the

money occurred in 1989. He denied taking drugs from Ward or owing Ward $50,000 for drugs and telling him that police had taken it. He admitted that he lied to the FBI.

Jeffrey Mims testified that in February and March of 1993, he owned and operated Creative Concepts in Houston. Mark informed him of the threats against their parents and resolved to pay off the people responsible. Jeffrey was angry with his brother because of some of Mark's relationships. Jeffrey said that he always tried to do the right thing and associate with good people. He claimed that he was arrested for the homicide while paying traffic tickets in Houston.

Jeffrey testified on cross-examination about the extent of his business. He had approximately ten regular employees, an inventory of at least one hundred cars, and a monthly payroll of $20-22,000. Over ten to fifteen years he had operated other businesses and had accumulated the cash he took with him to New Orleans; he often used cash to make business purchases, such as a automobiles. He was presented, however, with his 1992 federal income tax returns showing a total contract labor cost for that year of $10,031; $42,360 gross profit; and $72,300 total income for him and his wife.

Jeffrey admitted that there were inaccuracies in his first statement to the FBI. He said he was in the van when Eddie Charles was shot and did not see who shot him. He denied pointing a gun at anyone and said Mark did not have an AK-47 when the police approached the van. He also denied that they painted the van windows black. He did admit

to wiring money to his wife from Baton Rouge. He denied knowing a woman named Sheila Newman or spending any time with a woman in Baton Rouge. He denied that either he or Mark got into a fight in the French Quarter and said that, to the best of his knowledge, neither the Stewarts nor Wyre got into a fight there.

Jeffrey believed that Wyre came with them voluntarily. Jeffrey said he drove the van to Eddie Charles' residence, while Mark walked to the front door with the briefcase of money. He heard arguing, and the Stewart brothers ran out, leaving him and Wyre in the van. He subsequently heard repeated gunshots, and Mark and the Stewarts ran back to the van. Nothing was said as they drove away, but Mark told him in the French Quarter that Keith Stewart shot Eddie.

Dennis Olvany, a supervisor with the state probation and parole office, testified regarding factors his office considers when making a sentence recommendation in a presentence investigation report. He said that the length of time a person has already served in jail awaiting trial or other disposition prior to a plea of guilty is not a factor in recommending a sentence.

## Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") includes a comprehensive overhaul of federal habeas corpus legislation, including 28 U.S.C. §2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for

questions of fact, questions of law and mixed questions of fact and law where there has been an adjudication on the merits in State court proceedings.

State court determinations of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1) and receive deference unless they were "contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States."  *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).  The United States Supreme Court has advised that:

> Under the "contrary to" clause, a federal habeas corpus court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 413, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000); *Hill*, 210 F.3d at 485.  Questions of fact found by the state court are "presumed to be correct ... and we will give deference to the state court's decision unless it was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Hill*, 210 F.3d at 485, quoting 28 U.S.C.§ 2254(d)(2).

## Insufficient Evidence (Claim 1)

Petitioners were jointly tried on the offense of first degree murder and the jury returned the responsive verdict of manslaughter.  The Mims brothers claim that the evidence adduced at trial was insufficient to convict them as principals to the offense of manslaughter, a specific intent crime.  They further argue that the evidence was "scant to show specific intent" on the part of either of them to commit the homicide.[15]  Moreover, petitioners argue that the evidence was insufficient to prove that "either Mims knew Eddie Charles was to be killed and less evidence that they possessed the intent to inflict bodily harm or kill Eddie Charles."  Petitioners further argue that the Stewart brothers' statements were inconsistent and dubious, as both Mims brothers were concerned about their families' safety and sought to confront one Walter Ward.  The Mims brothers conclude that the prosecution failed to prove the requisite specific intent on the part of either of them to commit first degree murder, or manslaughter.[16]

-----

[15]See Federal Record, Doc. No. 1, Petition, page 5, Ground One.

[16]See Federal Record, Doc. No. 1, Memorandum in support of Petitioner's Writ of Habeas Corpus, page 43.  Jeffrey Mims first argued insufficiency of the evidence on direct appeal.  Both Jeffrey and Mark Mims presented identical claims of insufficiency of the evidence in their separate state applications for post-conviction relief.  They claimed that the prosecution failed to prove which of the four defendants was the actual offender.  See State Record, Vol. 2 of 15 for copies of Jeffrey and Mark Mims' Uniform Applications for Post Conviction Relief, page V, claim I.

Respondent argues that the petitioners' presented nothing to justify this Court to conclude that Louisiana Court of Appeal, Fourth Circuit's denial of relief on this issue was unsupported by the record, or was an unreasonable application of federal law. Moreover, respondent suggests that the trial evidence was sufficient to convict Mark Mims and Jeffrey Mims of the responsive verdict of manslaughter and of the charged offense of first degree murder. The respondent further argues that under state law, in order to sustain the responsive verdict of manslaughter, the evidence must be sufficient to convict the petitioners of the original charge of first degree murder. See **State v. Schrader**, 518 So.2d 1024, 1034 (La. 1988), cert. denied, 498 U.S. 903, 111 S.Ct. 265, 112 L.Ed.2d 221 (1990).[17]

The Supreme Court clearly established the federal law as to sufficiency of evidence claims made in petitions for habeas relief in **Jackson v. Virginia,** 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1976). The **Jackson** test requires a reviewing court to find that no rational trier of fact, after viewing the record in the light most favorable to the

---

[17]The Louisiana Supreme Court addressed the legitimacy of a responsive (compromise) verdict of manslaughter when the defendant was tried on a murder charge in **State v. Schrader,** 518 So.2d at 1034 as follows:

> The appellate court was correct insofar as it held that, absent a contemporary objection, a defendant may not complain if jurors return with a legislatively approved responsive verdict, whether or not *that* verdict is supported by the evidence. This Court has indicated that such a result both recognizes the legitimacy of a "compromise" verdict and comports with the responsive verdict scheme of La.C.Cr.P. art. 814. **State ex rel. Elaire v. Blackburn,** 424 So.2d 246 (La.1982). However, and as **Elaire** made clear, there is an important proviso to this rule: the evidence must be sufficient to sustain a conviction on the charged offense. **Id.** at 251.

prosecution, could have found all the elements of the crime proved beyond a reasonable doubt.  **Id.,** at 319.  In applying the **Jackson** test, the U.S. Fifth Circuit has instructed a reviewing court to examine "the substantive elements of the criminal offense as defined by state law."  **Dupuy v. Cain**, 201 F.3d 582, 589 (5th Cir. 2000).

In its analysis of petitioner's insufficiency of evidence claim, the Louisiana Court of Appeal, Fourth Circuit first set forth the applicable law, stating in pertinent part:

> By this assignment of error, Jeffrey Mims claims the evidence was insufficient to support his conviction for manslaughter. This court set out the well-settled standard for reviewing convictions for sufficiency of the evidence in **State v. Ragas,** 98-0011 (La.App. 4 Cir. 7/28/99), as follows:

> In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of act could have found the defendant guilty beyond a reasonable doubt.  **Jackson v. Virginia,** 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979):

> ...

**State v. Mims,** 769 So.2d at 63.

The Louisiana Courts of Appeal, **State v. Mims,** 769 So.2d at 64-65, set out the applicable state law regarding the definitions of the following offenses:

> ... La. R.S. 14:31 defines manslaughter in pertinent part as:
> (1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood

immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection····.
(2) A homicide committed, without any intent to cause death or great bodily harm.
(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person; ···

La. R.S. 14:30 defines first degree murder in pertinent part as the killing of a human being:
(1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, second degree kidnapping, aggravated escape, aggravated arson, aggravated rape, forcible rape, aggravated burglary, armed robbery, drive-by shooting, first degree robbery, or simple robbery.

La. R.S. 14:30 defines second degree murder in pertinent part as the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2)(a) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, drive-by shooting, armed robbery, first degree robbery, or simple robbery, even though he has no intent to kill or to inflict great bodily harm.

It was the State's theory of the case that defendants kidnapped Leo Wyre before the death of Eddie Charles. Both aggravated kidnapping, La. R.S. 14:44, and second degree kidnapping, La. R.S. 14:44.1, define kidnapping as:
(1) The forcible seizing and carrying of any person from one place to another; or
(2) The enticing or persuading of any person to go from one

place to another; or
(3) The imprisoning or forcible secreting of any person.

La. R.S. 14:44 defines aggravated kidnapping as a kidnapping "with the intent thereby to force the victim ⋯ to give up anything of apparent present or prospective value, or to grant any advantage or immunity, in order to secure a release of the person under the offender's actual or apparent control." Under La. R.S. 14:44.1, a second degree kidnapping is one wherein the victim is, among other things, "[u]sed to facilitate the commission of a felony" or "[i]mprisoned or kidnapped when the offender is armed with a dangerous weapon⋯."

La. R.S. 14:27(A) provides for attempts and states:
Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

As there were four defendants involved in the incident-the Mimses and the Stewarts-the law of principals is applicable. La. R.S. 14:24 states:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
. . .
Specific intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1); **State v. Hampton,** 94-1943, p. 4 (La.App. 4 Cir. 12/27/96),

35

686 So.2d 1021, 1024, writ denied, 97-0166 (La.6/13/97),
695 So.2d 986.

The Statement of Facts section of this report is hereby incorporated in this section of this report as though fully printed out.

The following summary of the trial testimonies of some of the witnesses established that Jeffrey and Mark Mims each had specific intent to kill Eddie Charles and/or to inflict great bodily harm on Charles; that Jeffrey and Mark Mims killed Eddie Charles after kidnapping Leo Wyre, while armed with pistols; that there was trial evidence which established that Jeffrey and Mark Mims were guilty as principals to first degree murder of Eddie Charles; and, that the jury verdict of guilty of manslaughter was a lawful responsive verdict.

Leo Wyre and his wife Zena Wyre testified that Mark Mims and Leroy Stewart brandished guns in the Wyre's residence and forced Leo Wyre to accompany them in their search for Walter Ward.  (See State Record Supplemental Volume 2 of 5, pages 201-204 and 261-262)(hereinafter referred to as St. Rec. Suppl. Vol.))  Leo Wyre said that when Ward could not be found that the Mims started looking for Eddie Charles.  (St. Rec. Supp. Vol. 2 of 5, pages 206-207; Also see testimony of Keith Stewart, St. Rec. Supp. Vol. 2 of 5, page 429.))  Leo Wyre also said that Mark Mims told Jeffrey Mims to shoot Leo Wyre if he did not cooperate.  (See St. Rec. Supp. Vol. 2 of 5, pages 208-209.)

Keith Stewart and Leroy Stewart testified that Jeffrey Mims, while armed with a gun, along with Keith Stewart approached Eddie Charles' residence. (St. Rec. Supp. Vol. 2 of 5, pages 430 and 349.) Keith Stewart said that Jeffrey Mims pulled a gun, grabbed Eddie Charles and shot him. (St. Rec. Supp. Vol. 2 of 5, pages 430 and 431; Also see Leo Wyre's testimony **Ibid**., page 211.)

Moreover, Leo Wyre said that he heard Eddie Charles call-out twice for his mother, followed by the sound of approximately six gun shots. (St. Rec. Supp. Vol. 2 of 5, pages 210-211.)

Mark Mims testified that the 9mm Beretta pistol, with the black handle, belonged to him. (St. Rec. Supp. Vol. 3 of 5, page 80.) The same pistol was determined to have been used to murder Eddie Charles. (See testimonies of Officer Bernard Mitchell, St. Rec. Supp. Vol. 1 of 5, pages 39-40; and Officer Kenneth Leary, firearms identification expert, St. Rec. Supp. Vol. 2 of 5, pages 160-161.)

Dr. Susan Garcia, forensic pathologist, recovered three bullets from the body of Eddie Charles during the autopsy. (St. Rec. Vol. 1 of 5, pages 113-114.)

The trial facts clearly established that the evidence was sufficient to justify and to sustain convictions of both Jeffrey Mims and Mark Mims as principals to first degree murder, the original charge in the indictment. Both of the Mims had specific intent to kill or to inflict great bodily harm upon Eddie Charles as demonstrated by their armed

37

kidnapping of Leo Wyre, their luring of Eddie Charles out of his house and their shooting of Charles outside of his house.

Moreover, the jury's verdict of guilty to manslaughter is a lawful responsive verdict.

The Louisiana Court of Appeal, Fourth Circuit applied the appropriate legal standard for reviewing convictions for sufficiency of the evidence as mandated in **Jackson v. Virginia, supra,** when it reviewed Jeffrey Mims' claim of insufficiency of evidence on direct appeal.  See **State v. Mims**, 769 So.2d 44, 63 and 67 (La. App. 4th Cir. 2000).

The Fourth Circuit concluded, in pertinent part:

> Moreover, considering all of the evidence in the light most favorable to the State, a rational trier of fact could have found beyond a reasonable doubt that Jeffrey was a principal to the aggravated or second degree kidnapping of Wyre, during the course of which Charles was killed.  This would constitute second degree murder, or "felony-murder," a crime for which specific intent to kill or inflict great bodily harm was unnecessary.  Considering the threats made on Jeffrey's parents and family, the jury could have generously given him the benefit of any and all doubt, felt that he committed the homicide in sudden passion or heat of blood, and thus found him guilty of manslaughter pursuant to La. R.S. 14:31(A)(1)-or the jury could have simply returned a "compromise verdict" of guilty of manslaughter.
>
> ...

See **State v. Mims,** 769, So.2d at 67.

Mark Mims and Jeffrey Mims brought the insufficiency of the evidence issue on post-conviction relief applications in the trial courts and in the Fourth Circuit. The trial court said:

> "I find that there is evidence, overwhelming evidence to support the conviction of each gentleman." (See State v. Mark Mims and Jeffrey Mims, case No. 364969 "F," Ruling, July 25, 2003. A copy is found in the St. Rec. Vol. 3 of 15.)

The Fourth Circuit denied relief and stated:

> "As to the sufficiency of the evidence raised by relator Mark Mims, the evidence at trial was sufficient to support the jury's verdict of manslaughter; thus, the trial court properly denied his claim."

See **State v. Jeffrey and Mark Mims**, No. 2003-K-1692 (La. App. 4th Cir. Nov. 13, 2003). (A copy of the ruling if found in the St. Rec. Vol. 3 of 15.)

Based upon the above, the court finds that the Louisiana Fourth Circuit Court of Appeal's rejection of petitioners' insufficiency of evidence claims does not represent an unreasonable application of Supreme Court law, specifically, **Jackson v. Virginia, supra,** to the facts of this case. Accordingly, the court finds that the instant claim for federal habeas corpus relief is without merit.

## Recusal of Trial Judge (Claim 4)

Petitioners' claim that the trial judge's refusal to recuse himself from the trial of the case resulted in violations of their due process rights. They argue based upon **In re**

39

**Murchinson, et al,** 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955) that a fair trial in a fair tribunal is a basic requirement of due process of law.  Specifically, petitioners claim that the trial judge, through his minute clerk Jake Lemmon, participated in counseled and uncounseled plea negotiations between co-defendants Keith and Leroy Stewart, in order to get them to testify against petitioners.  Petitioners also argue that the trial judge arranged for the appointment of Rick Tessier, Esquire, and the withdrawal of Bruce Ashley, Esquire during the case to facilitate plea negotiations.

This issue and argument have been addressed by the state appellate court on direct appeal and supervisory writ and by the state district court during post-conviction proceedings.  The Louisiana Court of Appeal, Fourth Circuit rejected the claim that the trial court erred in denying Jeffrey Mims' motion to recuse on the ground that the court's minute clerk, Jake Lemmon, participated in a plea bargain agreement with the Stewart brothers.  (See **State v. Mims,** 769 So.2d 44 at 68-70).  The Fourth Circuit concluded:

> Here, however, defendant Jeffrey Mims failed to rebut the presumption of the trial court's impartiality and, thus, to set forth a valid ground for recusal.  There is no evidence that the trial judge acted improperly or that the trial court was biased in favor of the Stewarts and against Jeffrey Mims.  While the minute clerk's actions were improper, his testimony regarding the purely administrative purpose of his visit to the Stewarts notwithstanding, there is no evidence of resulting prejudice to Jeffrey.  Therefore, we cannot say that the court's denial of Jeffrey Mims' motions to recuse was an abuse of discretion.
>
> This assignment of error is without merit.

**State v. Mims,** 769 So.2d at 70.

Petitioners argue that the evidence adduced in the post conviction hearings refuted the Louisiana Fourth Circuit's contention that Jake Lemmon's visit was "purely administrative."  The Mims also claim that the trial court was impermissibly involved in manipulating the Stewarts into guilty pleas behind closed doors.  (See Fed. Rec. Doc. No. 1, Petition, Memorandum page 51.)

The State argues that petitioners have presented no basis upon which to conclude that the Fourth Circuit's rejection of the issue and the rejection by the trial court during post conviction proceedings were incorrect.  Moreover, the State contends that petitioners have been unable to produce any evidence that they were biased by ex parte communications between the minute clerk (Jake Lemmon) and the Stewart brothers.  (See Fed. Rec. Doc. No. 6, Response, page 19.)

On July 25, 2003, Honorable Dennis J. Waldron denied petitioners' motion for post conviction relief.  Judge Waldron said:

**BY THE COURT:**

The Court would deny any motion for post conviction relief, noting an objection to protect the record.  The Court finds that a review of the record, including all of the testimony that was presented, and I do applaud the effort of both sides and the manner by both sides, and I thank each side for that.  I find that there is no evidence of any impropriety, any misconduct, on the part of Judge Charles Ray Ward, the presiding Judge over this

matter; nor the then Ad Hoc Minute Clerk, now attorney, Mr. Jacob Lemmon; nor on the part of any of the attorneys who may have represented or considered representing Mr. Stewart and Mr. Stewart; nor on the part of any of the attorneys who represented Mr. Mims and Mims, and their presentation before the Court and before the Jury, as it relates to this matter.

See State Record, Vol. 3 of 15, for a copy of the Ruling.

The Louisiana Court of Appeal, Fourth Circuit, denied relief to petitioners regarding Judge Waldron's denial of their motion for post conviction relief.  Fourth Circuit said:

The relators, Jeffrey and Mark Mims, request a review of Judge Waldron's denial of their motions for post conviction relief based on their claim for recusal of the original judge who presided over the jury trial, as well as the claims of insufficient evidence and ineffective assistance of counsel.  We affirm.

We find that Judge Waldron correctly denied relators' recusal; claims as they failed to demonstrate that the original judge was not impartial.  The witnesses provided conflicting testimony. Jeffrey Mims reported that Keith and Leroy Stewart told him that they were coerced into pleading guilty by the law clerk/minute clerk's threat that the original judge would give them the death penalty if they went to trial.  However, Keith Stewart and the original court's law clerk/minute clerk testified that the law clerk/minute clerk did not mention the plea agreement when he spoke with the Stewarts.

...

We cannot conclude that the credibility decision should be disturbed where the trial court disbelieved the testimony of Jeffrey Mims.  Mark Mims failed to rebut the presumption of the original judge's impartiality, or set forth a valid ground for recusal.

42

> Because relators' recusal claim is without merit, the court, in
> reviewing the motions for post conviction relief, correctly
> denied their ineffective assistance of counsel claim regarding
> their counsel's failure to obtain a stay to investigate the
> allegations pertaining to the original court's law clerk/minute
> clerk's actions.

See **State of Louisiana v. Jeffrey and Mark Mims,** No. 2003-K-1692 (La. App. 4th, Nov. 13, 2003). (See State Rec., Vol. 3 of 15, for a copy of the unpublished opinion.)

Review of petitioners' complaints and of the state record fails to show that petitioners presented any evidence which established that the trial court and the Fourth Circuit denial of petitioners' claims of denial of a fair trial and due process of law because of the impartiality of the trial judge (refusal to recuse itself) was incorrect. Petitioners failed to prove a federal constitutional violation. Accordingly, the issue has no merit.

### Ineffective Assistant of Counsel (Claims 2, 5 & 7)

Petitioners argue that they were unconstitutionally denied effective assistance of counsel in claims 2, 5 and 7 of their habeas corpus petitions as follows:

> Claim 2 - Counsel failed to request jury instructions that each
> defendant had to have had requisite specific intent to be
> convicted as principals to manslaughter.

> Claim 5 - Counsel failed to file emergency writs for a stay
> regarding the trial judge's failure to recuse itself; and,

> Claim 7 - Counsel failed to object to the introduction of other
> crimes evidence.

43

The above claims will be addressed under the topic ineffective assistance of counsel.

In **Strickland v. Washington**, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel.  A convicted defendant seeking relief must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced his defense.  See **Strickland**, 466 U.S. at 697, 104 S.Ct. at 2069.  If this Court finds that petitioner has made an insufficient showing as to either of these two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the claim without addressing the other prong.  **Id.**

Petitioner carries the burden of proof and must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  See **Crockett v. McCotter**, 796 F.2d 787, 791 (5th Cir. 1986); **Matheson v. King,** 751 F.2d 1432, 1441 (5th Cir. 1985).  Under the deficient performance prong of the **Strickland** test, "it is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" **Lockhart v. Fretwell,** 506 U.S. 364, 371, 113 S. Ct. 838, 844, 122 L. Ed. 2d 180 (1993) (quoting **Strickland**, 466 U.S. at 690, 104 S.Ct. at 2066).  "An attorney's performance, which enjoys a strong presumption of adequacy, is deficient if it is objectively unreasonable."  **United States v. Acklen**, 47 F.3d 739, 742 (5th Cir. 1995).  Petitioner must prove that the conduct of counsel fell below the constitutional

44

minimum guaranteed by the Sixth Amendment.  See **Styron**, 262 F.3d at 450.   Analysis of

counsel's performance must take into account the reasonableness of counsel's actions in light

of all the circumstances.  See **Strickland**, 466 U.S. at 689, 104 S.Ct. at 2065.  A claim of

ineffective assistance of counsel is a mixed question of law and fact.  **Moore v. Cockrell**,

313 F.3d 880, 881 (5th Cir. 2002), cert. denied, 538 U.S. 969, 123 S.Ct. 1768, 155 L.Ed.2d

526 (2003).

Specific Intent and Principals (Claim 2)

Petitioners claim that their counsel failed to ask the court to instruct the jury

that the prosecution was required to prove that each defendant had specific intent to commit

the homicide before rendering a verdict of guilty as principals.  The respondent argues that

petitioners' claims are meritless because petitioners failed to establish attorney error and

because there is no proof that the jury was improperly instructed.  Review of the trial

transcript shows that there were no objections made to the jury charge.  (See State Record,

Vol. 4 of 5, Supp. page 83.)

The trial court's initial or primary jury instructions are not contained in the

state record.  Review of the state record shows that a copy of the supplemental jury

instructions are attached to petitioner's Supplemental Brief in Support of Petitioner's

Applications for Post-Conviction Relief - Appendix "B."  (See State Record, Vol. 3 of 15 for

copy of the supplemental jury instructions, pages 27-40 of Appendix "B".)

45

Study and review of the supplemental jury instructions show that the trial court properly and correctly instructed the jury concerning the requirement of individualized specific intent and on the law of principals.  The following excerpts are illustrative of the correctness of the instructions:

**DR. MURRAY (FOREPERSON):**

The question we have is, basically, could you explain to us in as laymen's terms as you can first degree and second degree and manslaughter?

**THE COURT:**

Okay.

First degree is the killing of a human being when the perpetrator has the specific intent to kill.  That means he desires the killing or wants the person dead, knows what he's doing, or if he wants to inflict great bodily harm, desires the dead person suffer great bodily harm and knows exactly what he's doing.  That's a pretty good definition of specific intent.   Actively desiring the consequences of his act to follow his act.

See Appendix "B," pages 27-28, lines 22-32 and lines 1-8.

Now, a person may be guilty of a first degree murder as a principal, but only if that person as a principal, meaning someone who aids, abets, counsels or procures another, does that as to the killing and has the specific intent to kill or to inflict great bodily harm.
. . .
So a person can be guilty of first degree murder under the theory rules of principals, only if he aided, abetted, counseled or procured another to commit the actual murder and had the specific intent to do that.

46

See Appendix "B," page 29, lines 6-13 and lines 21-26.

. . .

> Now, manslaughter is the homicide which would be the first
> degree murder or second degree murder but it's a homicide
> which occurs when the offense is committed in sudden passion,
> heat of blood immediately caused by provocation, sufficient to
> deprive an average person of the self-control and cool reflexion,
> or it's a homicide committed when there's an intent to commit
> a misdemeanor which directly affects the person.

See Appendix "B," page 31, lines 4-15.

> . . . A homicide is also manslaughter when it's committed
> without any intent to cause death or great bodily harm, when the
> offender is engaged in the perpetration or attempted perpetration
> of another felony, some other felony, or when the offender is
> engaged in an intentional misdemeanor directly affecting the
> person.

See Appendix "B," pages 31 and 32, lines 30-32 and lines 1-8.

Petitioner's have failed to prove that the jury instructions were erroneous as to require defense counsel to object to them.  The court's instructions conveyed the proper legal concepts.

Accordingly, counsel was not ineffective by virtue of his failure to object to the court's instructions.

Recusal of Trial Judge (Claim 5)

Petitioners' claim that their counsel was ineffective for failing to file emergency writs requesting a stay order prior to the recusal hearing; for failing to investigate

the circumstances surrounding the Stewart brothers' plea deal; and, for failing to pursue investigating the facts and witnesses supporting a motion for a new trial.

This issue was specifically denied by the trial court and the Louisiana Court of Appeal, Fourth Circuit and again by each court on post conviction and supervisory writs application.

As previously noted, the Louisiana Court of Appeal, Fourth Circuit denied this claim on supervisory writ. The Fourth Circuit said:

> Because relators' recusal; claim is without merit, the court, in reviewing the motions for post conviction relief, correctly denied their ineffective assistance of counsel claim regarding their counsel's failure to obtain a stay to investigate the allegations pertaining to the original court's law clerk/minute clerk's actions.

See **State of Louisiana v. Jeffrey and Mark Mims,** No. 2003-K-1692 (La. App. 4th Nov. 13, 2003). (See State Record, Vol. 3 of 15, for a copy of the unpublished opinion.)

The State is correct in its argument that the evidence adduced during the recusal evidentiary hearing and which was corroborated during the trial testimony of Leroy Stewart and again corroborated during the post conviction evidentiary hearings established that the trial court played no role in convincing the Stewarts to plead guilty in return for their testimony against the Mims.

Petitioners' counsels were not ineffective in failing to pursue a meritless claim. The law is clear that an attorney is under no obligation to raise an argument when the

chance of success is unlikely.  See **United State v. Kimler,** 167 F.3d 889, 893 (5th Cir.

1999)("An attorney's failure to raise a meritless argument . . . cannot form the basis of a

successful ineffective assistance of counsel claim because the result of the proceeding would

not have been different had the attorney raised the issue."); **Sones v. Hargett,** 61 F.3d 410,

415 n.5 (5th Cir. 19995)("Counsel cannot be deficient for failing to press a frivolous point.");

**Clark v. Collins,** 19 F.3d 959, 966 (5th Cir. 1994)("Failure to raise meritless objections is

not ineffective lawyering; it is the very opposite.").  Based upon the above, the court finds

it unlikely that counsels' failure to file emergency writs requesting a stay order prior to the

recusal hearing and counsels' failure to investigate witnesses supporting a motion for a

trial on the recusal; issue would have been successful.  Accordingly, petitioners, by virtue

of counsels' failure to file emergency writs and failure to investigate witnesses supporting

a motion for a new trial on the recusal issue, suffered no prejudice.  Therefore, the Mims

brothers' attorneys were not unconstitutionally ineffective.

Other Crimes Evidence (Claim 7)

Petitioners claim that their trial counsels were ineffective for failing to object

to the State's repeated presentation of other crimes evidence, thereby preventing petitioners

from having a fair trial.  Petitioners argue that the following instances of "other crimes" were

admitted against the Mims, without contemporaneous objections by trial counsel:

(1)     The alleged rip-off of the "Columbians";

    (2)      The sale of narcotics to "James" in Baton Rouge;

    (3)      The narcotics dog "Marco" supposedly alerting on U.S. currency in the van;

    (4)      Jeff Mims's possession of identity cards in another name;

    (5)      The testimony that narcotics traffickers possessed the types of weapons in the black van;

    (6)      Mark Mims' involvement with Walter Ward in narcotics transactions; and

    (7)      The supposed assault(s) in the French Quarter by the Mims brothers.

The State points out that the Louisiana Court of Appeal, Fourth Circuit considered and rejected the above claims concluding that the items of evidence at issue were properly admissible as part of the res gestae pursuant to La. C.E. art. 404(B)(1), which is the codification of the principle of "res gestae." State law as interpreted by the Louisiana Supreme Court in **State v. Brewington,** 601 So.2d 656 (La. 1992) provides:

> This Court has approved the admission of other crimes evidence when it is related and intertwined with the charged offense to such an extent that the State could not have accurately presented its case without it. (citation omitted)
>
> . . .
>
> And, because of the close connection in time and location, the defendant is unlikely to be unfairly surprised. (citation omitted.)

See **State v. Mims,** 769 So.2d 44, at 73. (Also note that the Fourth Circuit specifically addressed all seven of the instances at pages 73-75 of its opinion. For example, Instances 1-2, part of the res gestae; Instances 3-4, the evidence was necessary to the State's case in light of its theory of the use of the currency. Testimony about the guns was minimally relevant

to the State's case; Instance 5, false identification cards were part of the res gestae; Instance 6, involvement with Walter Ward's drug trafficking - counsel may have made a strategic decision not to object; and Instance 7, French Quarter altercation - there was no evidence that Jeffrey was the aggressor.  Mark pulled gun and the attorney for Jeffrey may have made the decision not to object to divert attention from Jeffrey to Mark.)

Federal habeas corpus review is limited to questions of constitutional dimensions, and federal courts generally do not review evidentiary issues under state law. **Jernigan v. Collins,** 980 F.2d 292, 298 (5th Cir. 1992), cert. denied, 502 U.S. 1113, 113 S.Ct. 2977, 125 L.Ed.2d 675 (1993).  Such review is proper only to determine whether a state trial judge's error is so extreme "as to render the trial fundamentally unfair or violate an explicit constitutional right." **Peters v. Whitley,** 942 F.2d 937, 940 (5th Cir. 1991), cert. denied, 502 U.S. 1113, 112 S.Ct. 1220, 117 L.Ed.2d 457 (1992); **Andrade v. McCotter**, 805 F.2d 1190, 1193 (5th Cir. 1986).  To constitute a denial of fundamental fairness, the evidence erroneously admitted at trial must be material in the sense of a crucial, critical, highly significant factor. **Andrade,** 805 F.2d at 1193; **Hills v. Henderson,** 529 F.2d 397, 401 (5th Cir.), cert. denied, 429 U.S. 850, 97 S.Ct. 139, 50 L.Ed.2d 124 (1976).

The Fourth Circuit properly applied the federal law as determined by the U.S. Supreme Court in **Strickland v. Washington**, 466 U.S. 668, in resolving the claim of ineffective assistance of counsel.  The defendant must show that counsel's performance was deficient and that the deficiency prejudiced him.  (See **State v. Mims,** 769 So.2d at 72.)

In the instant matter, petitioner's counsels failure to object to the introduction of the seven instances of other crimes evidence did not constitute ineffective assistance of counsel.  Petitioners have failed to demonstrate that their counsels' performances were deficient and the deficient performance prejudiced their defenses.  Accordingly, this issue is meritless.

### Motion to Suppress Evidence (Claim 3)

Petitioners claim that trial court erred by denying the motion to suppress the stop of the black van in the French Quarter and further erred by denying the motion to re-open the hearing on suppression and probable cause.  Particularly, petitioners claim that:  the stop was an illegal arrest; the warrantless search was unsupported by probable cause; the affidavit in support of the search warrant misrepresented the facts; and, the trial court should have re-opened the suppression and probable cause hearings.

Petitioners' ability to obtain federal habeas corpus relief with regard to alleged Fourth Amendment violations are greatly limited by the United States Supreme Court's decision in **Stone v. Powell,** 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).  In **Stone,** the United States Supreme Court held that a state prisoner is not entitled to federal habeas relief on the ground that evidence obtained in an unconstitutional manner was introduced at trial as long as the State provided "an opportunity for full and fair litigation" of his Fourth Amendment claim.  **Id.** at 3052.  See also **Davis v. Blackburn,** 803 F.2d 1371, 1372 (5th Cir.

1986).  A review of the state record in this matter reflects that such an opportunity was

afforded to the petitioners.  Evidentiary hearings were conducted before the state trial court

with respect to the motion to suppress the evidence.  During the hearing, petitioners argued

that evidence was wrongly obtained as a result of misrepresented facts, an illegal warrantless

search and the lack of probable cause.

Let the issues were raised in pretrial motions[18] and during hearings.  The trial court

denied the motion to suppress on November 4, 1994.[19]  The petitioners brought the same

issues in a motion and memorandum to reurge the motion hearings on May 23, 1995.[20]  The

trial court denied the motion on June 9, 1995.[21]

Let Petitioners applied for supervisory writs in the Louisiana Court of Appeal,

Fourth Circuit.  The application was denied.  The Court said:

> The record does not indicate that the trial court abused its
> discretion in refusing to reopen the motion to suppress hearing
> . . .

**State v. Mims, et al.,** No. 95-K-1587 (La. App. 4th Cir. Sept. 27, 1995).  See State Record,
Vol. 8 of 9 Supplemental, for a copy of the ruling.

_____

[18]See State Record, Vol. 1 of 9 Supplemental, Docket Master page 1, entry 09/03/93.
Also see State Record, Vol. 8 of 9 Supplemental, for copies of the motion to suppress filed Feb.
23, 1994.

[19]See State Record, Vol. 1 of 9 Supplemental, page 4, entry 11/04/94.

[20]See State Record, Vol. 8 of 9 Supplemental, for copies of the motion and memorandum.

[21]See State Record, Vol. 8 of 9 Supplemental, for a copy of the ruling dated June 9, 1995,
particularly pages 5-6 of the ruling.

Additionally, the Louisiana Court of Appeal, Fourth Circuit determined the petitioners' challenge regarding the denial of the motion to suppress to be meritless.  (See **State v. Mims,** 769 So.2d 44 at 67-68.)  Review of the state record shows that petitioner had an opportunity for full and fair review.  Accordingly, petitioners' claim is barred from federal habeas review.

### Prejudicial and Duplicitous Testimony of Officer Leary (Claim 6)

Petitioners claim that their 5th and 14th Amendment rights to due process of law and to a fair trial were violated when the trial judge allowed Officer Kenneth Leary, a firearms identification expert, to testify in detail concerning the weapons (AK-47s and shotguns) and various ammunition and clips found in the van Jeffery Mims was driving at the time of petitioners' arrests.  The testimony was admitted pursuant to La. C.E. arts. 401-402.  Petitioners claim that the court erred and that the testimony should have been excluded because the probative value of the evidence was outweighed by its prejudicial effect .

The Louisiana Fourth Circuit rejected petitioner(s) claim after considering the facts and circumstances of the case and said:

> ...(W)e are unwilling to say that the trial court, which was in the optimal position to evaluate the impact of the testimony on the jurors, abused its considerable discretion in applying La. C.E. art. 403.  Moreover, even if we assume that the trial court did abuse its discretion, we must conduct a harmless error analysis, determining whether the admission of the testimony was

> harmless beyond a reasonable doubt.  La. C.Cr.P. art. 921; **State v. Everidge,** 96-2665, p. 8 (La. 12/2/97), 702 So.2d 680, 685.

**State v. Mims**, 769 So.2d 44 at 72.

In conducting a harmless error (beyond a reasonable doubt) analysis, the Louisiana Fourth Circuit said:

> It is clear that the jury knew about the guns, ammunition and accoutrements before Officer Leary testified; and it was conceded by a police officer during trial that all of the guns, ammunition and accoutrements found in the van were legally possessed by the Mimses.  The jury knew that these firearms played no role in the death of Eddie Charles and that all four defendants had equal access to them.  More importantly, the jury was presented with significant circumstantial and direct evidence that Jeffrey Mims shot Charles multiple times or was otherwise involved in the shooting as a principal.

> We accordingly hold that, even if the trial court did abuse its discretion in failing to exclude Officer Leary's elaborative testimony, the error was harmless beyond a reasonable doubt.  That is, the guilty verdict rendered in this case was surely unattributable to the admission of the testimony about the additional, unused armaments.  **Everidge,** 702 So.2d at 685.

> This assignment of error is without merit.

**State v. Mims,** 769 So.2d at 72.

The state appellate court reviewed this claim on direct appeal, stating that even if the evidence was improperly admitted, then pursuant to La. C.Cr. P. art. 921, the error was "harmless beyond a reasonable doubt".  **Mims,** 769 So.2d at 72.  This standard of review is comparable to the standard set forth in **Chapman v. California**, 386 U.S. 18, 87 S.Ct. 824

(1967). **Chapman**, which is limited in its application to issues reviewed on direct appeal, requires a reviewing court to affirm a harmless error when that court is "able to declare a belief that it was harmless beyond a reasonable doubt." **Id.** at 24, 87 S.Ct. at 824. Further, a constitutional error is harmless when "it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. " **Id.** The fact that the state appellate court did not cite to **Chapman** is of no moment, as the U.S. Supreme Court has ruled that [a] state court's decision is not "contrary to ... clearly established Federal law" simply because the court did not cite [Supreme Court] opinions." **Mitchell v. Esparza**, 540 U.S. 12, 16, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003)(per curiam)  A state court need not even be aware of Supreme Court precedents, "so long as neither the reasoning nor the result of the state-court decision contradicts them." **Id.**  Thus, in evaluating a state appellate court's harmless error determination on collateral review under 28 U.S.C. §2254(d)(1), the question would be whether the court unreasonably applied **Chapman** or reached a decision contrary to it. A federal habeas court may not grant habeas relief, however, if the state court simply erred in concluding that the State's errors were harmless; rather, habeas relief is appropriate only if the Louisiana Court of Appeals applied harmless-error review in an "objectively unreasonable" manner. **Lockyer v. Andrade**, 538 U.S. 63, 75-77, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003); see also **Woodford v. Visciotti**, 537 U.S. 19, 25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) *(*per curiam*); **Williams v. Taylor**, 529 U.S. 362, 410, 120 S.Ct. 1495,

146 L.Ed2d 389 (2000)(An " *unreasonable* application of federal law is different from an *incorrect* application of federal law").

Based upon the foregoing deferential standard and considering the totality of the evidence offered by the State against the Mims brothers, the court cannot find that the Louisiana Court of Appeal, Fourth Circuit's rejection of petitioners' claims was based upon an unreasonable application of Supreme Court law, specifically **Chapman v. California, supra.** Moreover, it is clear from the record that the jury was already aware of the guns and ammunition located in the van prior to Leary's testimony. Accordingly, the court finds that the instant claim for federal habeas corpus relief is without merit.

**Prosecutor's Improper Argument (Claim 8)**

Petitioners claim that the prosecutor's rebuttal argument was violative of their right to due process of law under the 5th and 14th Amendments. The portion of the rebuttal argument complained of is the following:

> And these soldiers of death, they came to New Orleans, and on the late night of March the 6th in a quiet Gentilly neighborhood, people were going about their business, sleeping, maybe watching the news, reading to their children, not knowing death was passing them by, that death passed their house twice that night, not knowing that during this plan, the missiles of death would not only be the five kilos of cocaine, which would ultimately be turned into grams of cocaine, rocks of cocaine, slowly but surely, which are killing our society.

See Federal Record, Doc. No. 1, Memorandum in Support of Petitioner's Writ of Habeas Corpus, page 56.

57

Prosecutorial misconduct can amount to constitutional error if the conduct so infects the trial with unfairness as to make the resulting conviction a denial of due process such as to justify a mistrial or a reversal of the conviction. See **Darden v. Wainwright,** 477 U.S. 168, 181, 106 S.Ct. 2464, 2471 (1986). When an appellate court reviews a claim of prosecutorial misconduct, it considers whether the prosecutor's comments were improper and then whether the defendant's due process rights were violated. See **United States v. Williams,** 343 F.3d 423, 437 (5th Cir. 2003).

The Louisiana Court of Appeal, Fourth Circuit reviewed and considered this claim and rejected it as follows:

> The prosecutor's references to cocaine and its effects on our society were clearly inappropriate in this homicide case. The prosecutor was blatantly appealing to the jurors' sense of concern for their community and, thus, to their emotions. However, the evidence presented at trial showed that drug trafficking was included in the events leading up to the murder of Eddie Charles and that the defendants financed their search for Walter Ward in part through the sale of drugs. The State relied in part on the defendants' activities prior to coming to New Orleans to establish that the defendants were capable of - and perhaps prone to - forming the specific intent to kill Walter Ward and anyone who would not fully assist them in their plan or who would otherwise hinder them in their execution of their plan, whether intentionally or unintentionally. We accordingly find that the prosecutor's comments, while improper, were not without some, albeit slight, justification in relation to the trial as a whole. And again, because of the significant physical evidence connecting Jeffrey Mims with the murder, we do not believe that these remarks contributed to the verdict rendered against him.

58

This assignment of error is without merit.

**State v. Mims,** 769 So.2d 44, at 76.

Based upon the foregoing, the court finds that the Louisiana Court of Appeal, Fourth Circuit rejection of petitioners' prosecutor's improper argument (misconduct) claim does not represent an unreasonable application of Supreme Court law, specifically **Darden v. Wainwright, supra.** Accordingly, this claim is meritless.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the applications for federal habeas corpus filed on behalf of Jeffrey Mims and Mark Mims be **DENIED WITH PREJUDICE.**

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. **Douglass v. United Services Auto. Ass'n,** 79 F. 3d 1415, 1430 (5th Cir. 1996).

New Orleans, Louisiana, this 31st day of May, 2006.

LOUIS MOORE, JR.
United States Magistrate Judge